**Robert Earl MISTER, on Behalf of himself and all others similarly situated, Plaintiffs,**

v.

**ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant.**

**Civ. No. 81–3006.**

United States District Court, S.D. Illinois.

March 26, 1992.

On Motion to Certify for Permissive Interlocutory Appeal April 22, 1992.

See also 680 F.Supp. 297.

Jerome J. Schlichter, Schlichter Law Associates, Fairview Heights, Ill., Michele M. Lowe, Schlichter Law Associates, St. Louis, Mo., for plaintiffs.

Kenneth L. Halvachs, Gundlach, Lee, Eggmann, Boyle & Roessler, Belleville, Ill., for defendant.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

A number of issues remain to be resolved in this case. Pending before the Court are a Motion to Disqualify the Special Master and a Motion to Lift Stay. Prior to ruling on these motions, a number of issues relating to the proper measure of damages need to be resolved. The resolution of these issues at this juncture should ensure a smoother disposition of the case.[1]

### I. Review of Litigation

The plaintiff, Robert Earl Mister, a black male, filed this action on January 9, 1981, against the Illinois Central Gulf Railroad Company, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.;* 42 U.S.C. § 1981; and 42 U.S.C. § 1985. Mister alleged that the defendant refused to hire him because of his race. In addition to the individual claim, the Court allowed the plaintiff to represent a class of all black persons who had applied for jobs and been wrongfully rejected due to the defendant's racially discriminatory practices with regard to hiring within the defendant's St. Louis, Missouri, Operating Division.

### District Court Proceedings

On October 11, 1985, the Court granted the defendant summary judgment on the plaintiff's claims under 42 U.S.C. § 1985. A bench trial was held on the remaining claims in November 1985, through January 1986. On August 7, 1986, the Court issued a memorandum and order finding the judgment should be entered in favor of the defendant on both the individual and the class claims. *Mister v. Illinois Central Gulf Railroad Co.,* 639 F.Supp. 1560 (S.D.Ill.1986), *rev'd* 832 F.2d 1427 (7th Cir. 1987), *cert. denied* 485 U.S. 1035, 108 S.Ct. 1597, 99 L.Ed.2d 911 (1988).

In its August 7, 1986, memorandum, the Court recognized two possible theories of recovery for the class claims. The first was a disparate treatment claim alleging a pattern and practice of discrimination by the defendant. The second theory was a disparate impact claim, alleging that the defendant's hiring practices had a disparate and adverse impact on blacks.

The plaintiff's evidence at the bench trial consisted of a combination of statistical evidence and anecdotal evidence. The statistical evidence consisted of testimony by Dr. Leroy Grossman, a labor economist. Dr. Grossman utilized an applicant flow analysis to reach his conclusions. In other words, Dr. Grossman compared the per-

1. Plaintiff objects to the procedure chosen by the Court to decide the proper measure of damages. Specifically, plaintiff argues that the issue of damages is not properly before the Court because the defendant has filed no motion to challenge the amount or types of damages and the Special Master appointed by this Court has not filed his report. The issue is properly before the Court to clarify the order of reference to the Special Master. Since both sides have had an opportunity to brief the issue of damages and have taken full advantage of this opportunity, neither side can argue that its right to a hearing has been violated.

centage of black applicants for jobs in the defendant's St. Louis Operating Division with the percentage of black hires for that division. Dr. Grossman then calculated the standard deviation[2] for these two groups. Dr. Grossman concluded that the discrepancy in hiring rates between black applicants and white applicants could not have been due to chance. However, in comparing the percentages hired by ICG in the two groups, Dr. Grossman treated the St. Louis Operating Division as a single unit, and therefore did not take into account the distance from the work site to the applicant's residence.

The plaintiff also presented evidence that, between 1974 and 1983, blacks were excluded entirely from some job categories and that the highest percentage of black employees was found in the lowest paying job categories.

The anecdotal evidence presented by the plaintiff consisted of testimony relating to an incident which occurred on March 27, 1979, at the defendant's hiring office in Carbondale, Illinois. Capitol Employment Agency referred a large group of predominately black jobseekers (between 120 and 179) to the Carbondale hiring office. On March 27, 1979, these jobseekers were bused to the Carbondale hiring office to apply for jobs. Many of these individuals testified that they had filled out an application to work for the defendant; that they were ready, willing, and able to work; that they were willing to relocate; and that the defendant never contacted them about a job.

The defendant's evidence consisted of a three-fold attack on the plaintiff's statistical evidence. First, the defendant presented evidence to demonstrate that the data used by Dr. Grossman was incorrect. Second, defendant presented the testimony of its expert, a statistician by the name of Dr. David Peterson that there was no statistically significant difference between the number of white hires and the number of black hires. Third, the defendant presented evidence that distance between work site and residence was an important factor in hiring decisions, and this race-neutral factor accounted for any statistical discrepancy between white and black hiring.

Dr. Peterson testified that the applicant flow analysis used by Dr. Grossman was an inappropriate method since the applications used by Dr. Grossman for data were incomplete. Instead, Dr. Peterson compared the actual number of blacks hired by the defendant with the expected number of black hires based on data from the 1980 census. Dr. Peterson performed three analyses: one compared actual black hires with expected black hires on a county-by-county basis; the second compared actual black hires with expected black hires on the basis of EEO job categories and county-by-county; the third analysis compared hires by job locations. All these analyses resulted in a finding that either the variations between expected black hires and actual black hires were statistically insignificant or that the defendant had actually hired more blacks than expected if a random pattern of hiring had occurred.

The defendant also presented anecdotal evidence that distance between residence and job site was an important factor in hiring. Defendant presented testimony that absenteeism and tardiness were higher among workers who lived far from a job site than among those who lived close to a job site. Furthermore, workers who lived close to a job site were easier to call to work in the case of an emergency.

The Court found that Dr. Grossman's testimony established a *prima facie* case of discrimination under the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Specifically, the Court found that the applicant flow analysis prepared by Dr. Grossman showed significant statistical differences between the number of blacks

2. A standard deviation is a statistical measure which determines the disparity between two sets of variables, given the size of the samples. In general, a standard deviation of more than two indicates a high likelihood that the difference between the two sets of variables is not due to chance in random sampling, but rather is the result of some correlation between the variables.

who applied for jobs with the defendant and the number of blacks hired by the defendant during the relevant time period. This difference was sufficient to show a *prima facie* case under both plaintiff's theory of disparate impact and disparate treatment.

Having found that the plaintiff had established a *prima facie* case of discrimination, the burden shifted to the defendant to articulate a legitimate, non-discriminatory reason for its actions. The defendant presented testimony regarding the relationship between distance from work to an applicant's residence and defendant's hiring patterns. The defendant showed that most hires for a particular job site lived within fifty miles of the site. The defendant further showed valid, non-discriminatory reasons for hiring workers who lived close to a job site. Last, the defendant presented statistical evidence which, although flawed, tended to show that if distance were taken into account, the defendant did not discriminate. Based on this evidence, the Court found that the defendant did not violate Title VII or § 1981 in its hiring practices.

The Court also entered judgment in favor of the defendant on the individual claim of Robert Earl Mister. The Court found that the misstatements made by Mister on his employment application, coupled with his poor work history, disqualified him from consideration for employment with the defendant.

### Circuit Court Opinion

Disappointed in the Court's ruling, the plaintiff appealed to the Seventh Circuit. At the circuit court, the plaintiff argued that this Court's finding that distance provided a rational, non-discriminatory reason for the statistical discrepancies between white hires and black hires was in error. The defendant, in turn, argued that this Court erred in finding that the plaintiff had

presented a *prima facie* case of discrimination.

In an opinion written by Judge Frank H. Easterbrook,[3] the circuit court reversed judgment on the class claims but affirmed judgment on Mister's individual claims. The circuit court agreed with the finding that the plaintiff established a *prima facie* case of discrimination; indeed, the circuit court found it "hard to imagine a stronger case, short of an announcement of discrimination."[4]  832 F.2d at 1430.

The circuit court disagreed, however, that the defendant had articulated a rational, non-discriminatory reason for the hiring discrepancy. Specifically, the circuit court held that the defendant failed to establish that distance between residence and work site accounted for the discrepancy. Although the circuit court accepted that distance from worksite would be a sufficient answer to the disparate treatment claim, 832 F.2d at 1431–32, it found that the defendant presented no evidence that black applicants did in fact live farther from the work sites than white applicants. Without this sort of proof, the defendant did not articulate a legitimate, non-discriminatory reason for its acts. "When the defendant pronounces a reason unrelated to the plaintiff ('a midget can't do the job', followed by silence on the plaintiff's height), it has not adequately articulated a neutral reason within the meaning of [*Texas Department of Community Affairs v.*] *Burdine* [, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)]."  832 F.2d at 1434.

The circuit court added that, even if the defendant articulated a legitimate, non-discriminatory reason for the discrepancy, that reason was pretextual. The circuit court indicated that it was highly unlikely that distance between residence and work site explained the discrepancy. "The *only* explanations that have been offered for the disparity (and the only ones we can imagine in the absence of evidence that the black applicants had some systematic difference in qualifications from the white applicants)

---

**3.** And located at 832 F.2d 1427.

**4.** The circuit court reversed this Court's judgment on the basis of plaintiff's disparate treat-

ment theory. The circuit court expressly refused to base its decision on the plaintiff's disparate impact theory.

are discrimination and distance. To debunk the explanation based on distance is to compel the acceptance of the explanation from discrimination." 832 F.2d at 1435 [emphasis in original].

The circuit affirmed the judgment against Mister on his individual claim. The circuit court noted that Mister had lied on his application. This led to the conclusion by the circuit court that this Court's findings with regard to the individual claim were not clearly in error.

The defendants petitioned for rehearing, rehearing *en banc,* and for a writ of certiorari from the Supreme Court. All these petitions were denied. This Court received the mandate from the Seventh Circuit on December 17, 1987.

### Proceedings on Remand

The issue remaining on remand was a determination of the amount of damages. As a preliminary matter, the Court was requested to clarify which claims remained in the action. Specifically, since the Seventh Circuit opinion discussed solely the Title VII cause of action, the Court was asked whether the claim under § 1981 was still viable. The Court concluded, based on the language remanding the case, that the claims brought under § 1981 were still viable.

In September 1988 the Court entered an order of protocol designed to provide some guidance in the conduct of the remedies phase of this action. The Court decided to proceed with the computation of damages on a class-wide basis using the shortfall/pro rata method discussed by Judge Shadur in *Equal Employment Opportunity Commission v. Chicago Miniature Lamp Works,* 640 F.Supp. 1291, 1298–1300 (N.D.Ill.1986) and 668 F.Supp. 1150, 1153–55 (1987).[5] The shortfall/pro rata method was chosen because of the impossibility of determining which of the potential class members would have in fact received a job with ICG absent discrimination. In September 1989, the Court notified the parties

of its intention to appoint a special master under Federal Rule of Civil Procedure 53. On October 13, 1989, the Court entered an order appointing Thomas Meites, an attorney who specializes in employment discrimination cases, as a special master. The Special Master was authorized to proceed with a calculation of damages, back-pay or otherwise, based on a shortfall/pro rata method. The Master was further given authority to conduct any necessary hearings and to determine all matters relating to discovery and scheduling.

In the course of his duties, Special Master Meites entered an order titled "Special Master Order No. 26". In this order, Master Meites determined that punitive damages are an appropriate area of inquiry for the determination of the total amount of damages. Master Meites determined that the actions of the Carbondale hiring office on March 27, 1979, "can only be described as raw racial retribution—not one of the [black] East St. Louis applicants ever received a bona fide job offer anywhere in the system, even though in the ensuing months there were opening after opening (more than 10 of which were in East St. Louis, all of which went to whites)." Special Master Order No. 26 at 22 [footnote omitted]. In addition, Master Meites noted that the defendant's response to the Equal Employment Opportunity Commission charge filed by Mister as a result of the March, 1979, incident was misleading. For these reasons, Master Meites found that punitive damages would be appropriate.

Another issue in contention before the Special Master is the availability of certain types of compensatory damages. In addition to an award of back pay, the plaintiff is seeking an award for impaired earning capacity and for emotional distress. The plaintiff seeks to recover for impaired earning capacity under two theories, both closely related. The first theory is referred to as the "scarred worker effect". Essentially, plaintiff contends that the inability of the class members to receive jobs from ICG

---

**5.** Judge Shadur's finding of liability in *Chicago Miniature Lamp Works* was reversed by the Seventh Circuit in 947 F.2d 292 (7th Cir.1991).

due to discrimination by ICG made it more difficult for the class members to find other suitable jobs. Thus, the since the class members never made it past the first rung in the economic ladder, they were unable to take advantage of other opportunities to receive even higher paying jobs. The second theory, referred to as "union worker effect", is similar. Plaintiff contends that because the class members did not receive a job from ICG which would have entitled them to union membership, the class members were unable to take advantage of the higher paying jobs available to union members. Under both these theories, the plaintiff concludes that the discrimination by the defendant impaired the class's earning capacity. The plaintiff also seeks to recover, as a part of the claim for emotional distress, damages for the loss of value of life, i.e. hedonic damages.

Before the Special Master had an opportunity to present his final report and consider all the issues raised in the damage phase of this action, defendant filed a motion to disqualify or discharge the Special Master. Master Meites, as noted above, is an attorney who specializes in employment discrimination cases. Meites represents a class of airline attendants in a class action pending in the United States District Court for the Northern District of Illinois, *Long, et al. v. Trans World Airlines*, No. 86 C 7521 (N.D.Ill.). The defendant in the *Long* case retained the services of Dr. David Peterson as an expert. Dr. Peterson had also been retained by the defendant in this case. The defendant in this case claims that this constitutes a conflict of interest requiring disqualification of Master Meites. In addition, defendant argues that throughout the proceedings Master Meites had made rulings which are helpful to his law practice and are the result of bias in favor of the plaintiffs' bar in employment discrimination cases.

**6.** This conflict of interest has since resolved itself. Master Meites has informed the Court that the defendant in *Long* no longer intends to call Dr. Peterson as a witness. However, the other issues raised by the motion to disqualify have not been made moot.

In conjunction with the motion for disqualification, the defendant also filed a motion to stay proceedings. The motion requested that further discovery proceedings be stayed pending the determination of the motion to disqualify. The specific proceeding to which the motion was directed was the production of records reflecting the amount of the defendant's reserve for the payment of damages in this case. Because of the sensitive nature of this material, and because a substantial dispute existed over whether this sort of material is subject to discovery, the Court granted the motion to stay. Upon review of the motion, the Court was of the opinion that, prior to ruling on the motion to disqualify, certain fundamental issues regarding the availability of damages needed to be decided. The motivation for the motion to disqualify seemed less the concern over a potential conflict of interest than the concern over the effect of rulings made by Master Meites.[6]

In order to fully resolve those issues, the Court issued a case management order directing the parties to file a list of issues which each party would like the Court to consider. The purpose of asking for such a list was to clarify the law as to certain decisions made by the Special Master. Each party complied with the request, and filed a list of issues. The Court reviewed the list of issues submitted, and determined that a ruling by this Court on the question of what types of compensatory damages were recoverable and on whether punitive damages were recoverable would resolve many of the issues raised (by implication) in defendant's motion. Accordingly, the Court asked the parties to brief these issues. The end result, as envisioned by this Court, would be to modify the order of reference to the Master by giving guidance as to what damages are allowed.[7]

**7.** Such guidance would expedite the remaining discovery in this case. For example, if punitive damages are unavailable, then plaintiff would have no right to examine the financial data regarding defendant's reserves for this case. Also, if the hedonic and impaired earning damages requested by the plaintiff are not allowed, then a large amount of expert discovery and

## II. Compensatory Damages

■ In an action under Title VII, a plaintiff is limited to injunctive relief, "which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay, or any other equitable relief as the court deems appropriate...." 42 U.S.C. § 2000e–5(g). Punitive, nominal, and compensatory damages are not available under Title VII. *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990).[8] Therefore, in order to reach the plaintiff's other theories of damages, it is necessary that those damages be available under 42 U.S.C. § 1981, which allows for compensatory and punitive damages. *Johnson v. Railway Express*, 421 U.S. 454, 460–61, 95 S.Ct. 1716, 1720–21, 44 L.Ed.2d 295 (1975). This Court has already ruled that the mandate from the Seventh Circuit requires that judgment in favor of the defendant on the § 1981 claim be vacated, and there is no reason to revisit this ruling. However, the Court's ruling that a remedy is available under § 1981 does not mean that the Court has ruled that the damage theories relied upon by the plaintiff are available remedies.

### Back Pay

The plaintiff is entitled to an award of back pay under both Title VII and § 1981. The Court has previously determined, in its Order of Protocol, that the appropriate method for calculation of the back pay award would be the shortfall/pro rata method used by Judge Shadur in *Chicago Miniature Lamp Works*. The plaintiff is entitled to an award of all back pay due under this method of calculation.

■ Part of the calculation of back pay includes the value of work related benefits, such as health insurance. Plaintiff appears to argue that the value of work related benefits should be the actual benefits each class member would have received had he been employed by the defendant. For example, one black applicant for a job with ICG who was rejected subsequently became seriously ill with leukemia. Because he had no health benefits, he incurred substantial costs associated with his illness prior to his death. Plaintiff's counsel argues that "[c]learly, this man suffered a substantial injury beyond back pay and deserves compensation."

To award this class member the value of the benefits he would have received had he been covered by ICG's health insurance plan is inconsistent with the calculation of benefits on a class wide basis. If one were to evaluate health insurance coverage in this manner, the only recoverable amount would be the amount a class member could have claimed on his insurance. Therefore, if a class member did not incur any covered medical expenses during the class period, the value of the benefits would be zero. This inquiry requires individualized examination of each class member in order to determine whether the class member incurred any covered medical expenses. More importantly, it requires the Court to determine whether that class member would have been hired by ICG absent discrimination. The Court has already decided, in its Order of Protocol, that such an inquiry would be futile. Therefore, the calculation of the lost benefits (such as health insurance) should focus the value of the benefit, i.e. the cost to replace the benefit. In the context of health insur-

---

discovery of a cross-section of class members would become unnecessary.

**8.** The Civil Rights Act of 1991 allows a petitioner in a case brought under Title VII to recover compensatory and punitive damages of up to $300,000. Pub.L. No. 102–166, § 102, 105 Stat. 1071, 1072–74 (1991). There is much debate over whether the provisions of the Act apply retroactively or prospectively. *See e.g. Poston v. Reliable Drug Stores, Inc.*, 783 F.Supp. 1166 (S.D.Ind.1992) (applies retroactively); *Maddox v. Norwood Clinic, Inc.*, 783 F.Supp. 582 (N.D.Ala.1992) (does not apply retroactively); *Sanders v. Culinary Workers Union Local No. 226*, 783 F.Supp. 531 (D.Nev.1992) (applies retroactively); *Thompson v. Johnson & Johnson Management Information Center*, 783 F.Supp. 893 (D.N.J.1992) (does not apply retroactively). The Court need not consider the issue of whether the Act applies retroactively or not, since the damages provision of the Act applies only in cases where the complaining party cannot recover under 42 U.S.C. § 1981. Pub.L. No. 102–166, § 102(a), 105 Stat. 1072 (1991).

ance, the value of the benefit would be the premium for the insurance. This amount should be calculated on a shortfall/pro rata basis.

### Scarred Worker and Union Effects

■ In order for a plaintiff to recover damages under § 1981, there must be some reasonable connection between the wrongful act and the damages suffered. *See Edwards v. Jewish Hospital of St. Louis,* 855 F.2d 1345, 1353 (8th Cir.1988); *see also* D. Dobbs, *Handbook on the Law of Remedies* § 3.3 (1973) (identifying three rules of causation for an award of damages: 1) causation in fact; 2) reasonable proof of amount; and 3) denial of damages if they are too remote). In other words, the defendant's conduct must be the proximate cause of the plaintiff's injury.

"Proximate cause"—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation". As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundaries must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

W. Page Keeton (ed.), *Prosser and Keeton on The Law of Torts* § 41 at 264 (5th ed. 1984).

■ It is with these principles in mind that the theories of compensatory damages set forth by the plaintiff are addressed. Two of the theories of impaired earnings are closely related. The "scarred worker effect" theory is based on research by Dr. Stephen M. Hills, a professor of industrial relations at Ohio State University. Dr. Hills has found that, in addition to the loss of income caused by unemployment, the inability to land a job results in a loss of future earnings the individual would have otherwise made if he or she had been hired. Specifically, Dr. Hills's research found that "black teens experiencing unemployment in the late 1970s had lower wage rates five years later, with each month of unemployment reducing wage rates by about 2 percentage points." Stephen M. Hills, *Race and Sex Differences in the Effects of Early Unemployment on Wages,* Review of Black Political Economy Vol. 18 No. 4 (Spring 1990) at 28.

The "union worker effect" theory is similar. Once a person obtains a job which is unionized, there is a long-term enhanced probability of obtaining new unionized employment over what would have been the likelihood of doing so in the absence of a union job. Furthermore, union jobs tend to be higher paying and offer better benefits, at least for unskilled or semi-skilled workers. Plaintiff's expert, Dr. Hills, tentatively calculates the difference in wage rates between a union worker and a non-union worker at 24%.

Both these theories, while quite likely accurate descriptions of the labor market, suffer from two defects as legal theories of recoveries. First, both theories present difficulties of proof on a class-wide basis. In order for a "scarred worker effect" or a "union worker effect" to occur, there must be exclusion from employment (or from unionized employment) in more than one job. A job seeker does not apply with just one employer in the hopes of finding employment. Therefore, the effect described by Dr. Hills is the result of rejections from more than one job. On a class-wide basis, the plaintiff can show that a certain percentage of the class was excluded from only one job (i.e. the job for which the class member applied) due to ICG's discrimination. However, there appears to be no method of showing that, as a class, the applicants were precluded from all employment for any significant period of time due to the actions of ICG.

Moreover, not every applicant who applied for a job with ICG would have been given a job even absent discrimination. ICG hired only 31.2% of white applicants in 1979 and 6.1% of white applicants in 1980.[9] Despite plaintiff counsel's claim that each black applicant should have been hired because ICG had enough available jobs for each black applicant, not every black applicant would have been hired even absent discrimination. Therefore, proving who suffered diminished earning capacity and to what extent becomes problematic. Since the "scarred worker effect" and the "union effect" will not be universal (i.e. some class members will have obtained other employment), proving damages will require the kind of individualized inquiry class actions were designed to avoid.

Second, both the "scarred worked effect" and the "union worker effect" are the result of conduct by the labor market as a whole, rather than by individual firms. If ICG were the only employer for the class members, ICG would then be wholly responsible for any damages for the reduced earning capacity caused by their refusal to hire class members.[10] But ICG was not the only potential employer for these applicants.[11] A person searching for work, therefore, would be expected to apply to employers other than ICG. For the "scarred worker effect" and the "union worker effect" to occur, these other employers must also have rejected the class members' applications. Therefore, these other employers would have contributed to the diminished earning capacity of the class members, and ICG cannot be held liable for their actions.

In short, damages due to the "scarred worker effect" and "union worker effect" should not be recoverable as a matter of law in this action. First, the claims are not common to the class and cannot be proved on a class-wide basis. Second, holding ICG liable for the full amount of these damages would subject ICG to liability for acts over which it had no control. Ideally, no employer would discriminate against job applicants because of their race. To the extent that an employer does discriminate on the basis of race, federal statutes provide a remedy against that employer. The remedy does not, however, extend to all possible discrimination the plaintiff may have suffered. This would create "an infinite liability for all wrongful acts," and this Court does not believe that such damages are recoverable under § 1981.

### Emotional Distress and Hedonic Damages

■ Damages for emotional distress are recoverable under § 1981. *Ramsey v. American Air Filter Co., Inc.,* 772 F.2d 1303, 1313 (7th Cir.1985); *Okoro v. Jackson County Nursing Home,* 687 F.Supp. 1265, 1266 (S.D.Ill.1988); *see also Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978) (mental and emotional distress are compensable under 42 U.S.C. § 1983 upon proof that such injury was actually suffered). Although proof on the subject may be difficult, the plaintiff ought to be allowed to present evidence on these claims. It is quite clear that rejection from a job causes some emotional distress. That distress, coupled with a suspicion that the rejection was for racial reasons, is a recoverable damage under § 1981.

The question of determining the amount of damages for emotional distress is difficult in a class action, since the amount of distress suffered by each class member may vary widely. The Special Master has approved a sampling method to conduct discovery on this issue. Essentially, Master Meites has authorized discovery depositions with a random sample of the class. Based on this random sample, a conclusion on the level of emotional distress suffered

---

9. These are percentages of the total applicant pool. For a more detailed description by different categories, see 639 F.Supp. at 1568–69.

10. Of course, if ICG were the only employer, then the reduced earning capacity suffered by

the class members would become part of the back pay calculation.

11. This statement is particularly true in light of the statements by the class that they were willing to relocate for jobs.

by the class as whole may be reached. While the results of a random sample may show such a wide range of emotional distress that the calculation of damages on a class wide basis will be impossible, at this stage it is too early to reach this conclusion.

It may appear inconsistent to allow damages for emotional distress while not allowing the plaintiff to proceed on his theories of impaired earning capacity. At first glance, it would appear that both types of damages share the same problems of proof. The distinction between proof of emotional distress and proof of diminished earning capacity on a class-wide basis is a result of the almost universal feeling of distress as a result of racial discrimination. Diminished earning capacity, on the other hand, will be a very individualized effect. Showing that earning capacity was diminished due to either a "scarred worker effect" or a "union effect" requires proof that the individual was excluded from all jobs, not just the one laborer job offered by ICG.

■ The plaintiff also seeks to recover hedonic damages. Hedonic damages seek to compensate a plaintiff for the pleasure and satisfaction life provides apart from labor or earnings. "Hedonic damages compensate an individual for the loss of life and loss of the pleasures of living. They encompass the 'larger value of life ... including [the] economic ... moral ... [and] philosophical ... value with which you might hold life.' Other elements of the hedonic value of life may include an individual's expectations for the future as well as enjoyment of past activities. In contrast to damages for pecuniary loss, these damages involve a more subjective analysis of the pleasure that the particular individual derived from living." Tina Tabacchi, Note,

*Hedonic Damages: A New Trend in Compensation?*, 52 Ohio St.L.J. 331 (1991).

In this case, however, the only hedonic loss is caused by the lack of a job. The back pay award fully compensates the class for any hedonic damage. Once the class is awarded back pay, the past lost ability to enjoy life is fully restored, since the class has received the object which caused the deprivation. For example, in the personal injury context, a plaintiff who has lost an arm may have a claim for hedonic damages. However, if the arm was restored to him, his claim for hedonic damages would disappear, since he could no longer claim that he cannot enjoy the more subjective pleasures of life to the fullest.[12] Similarly here, the plaintiff class has been made whole by an award of back pay. To allow hedonic damages on top of the back pay would be equivalent to a double recovery.[13]

### Prejudgment Interest

The plaintiff is also entitled to an award of prejudgment interest. "Money today is simply not a full substitute for the same sum that should have been paid some time ago. Prejudgment interest therefore must be an ordinary part of any award of back pay (or other incurred expenses) under § 1981." *Williamson v. Handy Button Machine Company*, 817 F.2d 1290, 1297 (7th Cir.1987). No exception to this rule applies to this case, and therefore prejudgment interest should be awarded. Moreover, since hedonic damages are not recoverable in this lawsuit, the reasons for awarding prejudgment interest are more compelling. The class is being awarded back pay, which will make them whole. However, some award is necessary for the time between the loss of pay and the

**12.** This hypothetical plaintiff would, however, have claim for hedonic damages during the time he was without an arm. This aspect of the class claim is discussed below, in the section regarding prejudgment interest.

**13.** The Civil Rights Act of 1991 allows for recovery of compensatory damages for "loss of value of life." Pub.L. No. 102–166 § 102(b)(3), 105 Stat. 1073 (1991). However, the legislative history suggests that this recovery is limited to

cases of harassment. *See* H.Rep. No. 102–40(I), 102d Cong., 1st Sess. 66–69 (1991) (discussing specific examples of why back pay awards are inadequate; in all cases suggesting a "loss of value of life," the wrongful act was harassment). The Civil Rights Act of 1991 does not apply to this case in any event, since the plaintiff class has a viable claim under 42 U.S.C. § 1981. *See supra*, n. 8.

award. This amount is fully recovered by an award of prejudgment interest.

### III. Punitive Damages

■ "An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief and, under certain circumstances, punitive damages." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). The Supreme Court has stated that "in the absence of any persuasive arguments to the contrary based on the policies of [42 U.S.C.] § 1983, we are content to adopt the policy judgment of the common law—that reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages." *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983). In Special Master Order No. 26 ("SMO 26"), Master Meites applied the *Smith v. Wade* standard to this case, and determined that punitive damages were appropriate.

In SMO 26, Master Meites acknowledged that neither this Court nor the court of appeals had ever made a finding of reckless or callous disregard for the plaintiff's rights.[14] Master Meites, therefore, reviewed the evidence presented at trial and to him at the shortfall hearing in order to determine whether punitive damages would be available. In reviewing the evidence, Master Meites emphasized an incident at ICG's hiring office in March, 1979, and the subsequent EEOC investigation.

On March 27, 1979, Capitol Employment Agency in East St. Louis, Illinois, assembled a group of between 125 and 175 applicants, most of whom were black, to send to apply for a job with ICG. These applicants were sent by bus to the defendant's hiring office in Carbondale. The employment agency had notified the defendant that it was planning to send down a large group of applicants, although Mary Annette Lane, the clerk in charge of the hiring office, testified that the employment agency indicated that many of these applicants would not show up. In any event, there is no dispute that the number of applicants that arrived in Carbondale on March 27, 1979, was unusually large.

When the busloads of applicants sent by Capitol Employment Agency arrived in Carbondale, they were given applications and told to fill them out. None of the applicants were interviewed, although several other people at the hiring office (mostly white) were given interviews or physical examinations. These people had applied earlier and had been scheduled back for interviews and examinations. None of the applicants sent by Capitol Employment Agency were ever offered a job with ICG.[15]

Later that day or on the following day, a representative of the Capitol Employment Agency received a telephone call from Ms. Lane. She told the representative that the railroad had only five or six openings, and that in her experience the applicants from East St. Louis were unreliable.[16] The representative also received a phone call from a person who identified himself as a supervisor with ICG. The supervisor (who did not identify himself by name) asked the representative if he were responsible for sending "the minorities" to the Carbondale hiring office. When the representative answered affirmatively, the supervisor stated that the agency was not to contact the railroad again.

At no time did any railroad employee let the employment agency or any of the applicants know that it was accepting applica-

---

**14.** Plaintiff repeatedly quotes the Seventh Circuit's statement that "[i]t is hard to imagine a stronger case, short of an announcement of discrimination" as a rallying cry for the imposition of punitive damages. The Seventh Circuit used this language to describe the strength of plaintiff's evidence of a prima facie case. It is not a comment on ICG's intent to discriminate or level of disregard for plaintiff's rights.

Therefore, the comment is not helpful in determining whether punitive damages should be awarded.

**15.** The named class representative was offered a job after he filed his EEOC complaint.

**16.** East St. Louis's population is virtually all black.

tions for employment in East St. Louis on Wednesday afternoons.

As a result of the events of March 27, 1979, a complaint was filed with the EEOC by the class representative, Mister. In response to a questionnaire from the EEOC, ICG indicated that during March, 1979, it was hiring laborers to work in Fulton, Kentucky, approximately 225 miles from East St. Louis. ICG further stated that it could not determine the number of applicants hired by race from the applications received. Both of these statements were not true. During the spring of 1979, ICG was hiring for positions located throughout its system, including East St. Louis. Moreover, while the applications taken by ICG did not reveal the race of the applicant, the defendant kept those statistics separately in documents titled Monthly Employment Activity Reports.

Based on these facts, Master Meites determined that the defendant acted in callous disregard of the plaintiff's rights on March 27, 1979, in Carbondale. Master Meites relied on a combination of factors in reaching this conclusion: not one of the applicants from East St. Louis was ever offered a job with the defendant; white applicants were given interviews and physical examinations, with no explanation given to the black applicants; several employees of the defendant contacted the employment agency that same day or the following day, and made statements which could be read as disparaging to blacks. Master Meites also concluded that the defendant acted intentionally and purposefully to obstruct the EEOC investigation.

In objecting to these conclusions, the defendant argues that Master Meites used the wrong standard for deciding if punitive damages are warranted in this case. The defendant argues that the *Smith v. Wade* standard is designed for cases brought under § 1983, in which the plaintiff needs to overcome the defense of qualified immunity. For its part, plaintiff contends that this Court is obliged to accept the conclusions of the Special Master unless "clearly erroneous" under Federal Rule of Civil Procedure 53(e)(2). With regard to the legal

basis for an award of punitive damages in this case, both these contentions are wrong.

Federal Rule of Civil Procedure 53(e)(2) states that "the court shall accept the master's *findings of fact* unless clearly erroneous." Fed.R.Civ.P. 53(e)(2) [emphasis supplied]. The standard for determining if punitive damages are available is a question of law. It is emphatically the Court's province to determine what the law is in a given case. To the extent that the plaintiff is contending that a district court cannot overturn a special master's conclusions of law unless they are clearly erroneous, the plaintiff's contention must be rejected. If the special master applied the wrong law, it is this Court's duty to reject his findings and clarify the point of law.

In this case, however, Master Meites was entirely correct in applying the *Smith v. Wade* standard to a § 1981 claim. In arguing that *Smith v. Wade* does not provide the proper standard, the defendant relies on the following statement by the Seventh Circuit:

*Smith v. Wade* suggests that any conduct violating § 1983 may support an award of punitive damages. This is deceiving, however, because the Court also observed that the plaintiff under § 1983 must also surmount the defense of official immunity (461 U.S. at 55, 103 S.Ct. at 1639). The complete rule applicable to a defendant without the benefit of immunity may be that intentional, illegal conduct may support an award of punitive damages when the application of the law to the facts at hand was so clear at the time of the act that reasonably competent people would have agreed on its application. See *Soderbeck v. Burnett County,* 752 F.2d 285, 289–91 (7th Cir. 1985) (punitive damages usually depend on specific intent to violate a known right). Cf. *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987). An approach of this character still supports the submission of the question to the jury, given the clarity of the rule against racial discrimination in employment.

*Williamson v. Handy Button Machine Company*, 817 F.2d 1290, 1296 (7th Cir. 1987).

The defendant seizes upon the omission of reckless disregard in *Williamson*'s discussion of the interplay of qualified immunity and punitive damages, and argues that the appropriate standard for an award of punitive damages is a showing of intentional conduct. *Williamson* itself cites *Smith v. Wade* with the notation that it is "a case decided under § 1983, but equally applicable under § 1981". *Id.* Defendant thus ignores the explicit recognition by the Seventh Circuit that *Smith v. Wade* has currency in the context of a § 1981 action. This Court believes that the application of *Smith v. Wade* to a § 1981 claim requires recognition of the possibility that reckless disregard for plaintiff's rights may be a basis for punitive damages. More relevant to this case is the last sentence quoted above: "An approach of this character still supports the submission of the question to the jury, given the clarity of the rule against racial discrimination in employment." Whatever concerns the Seventh Circuit harbors over the absence of qualified immunity in actions against private actors under § 1981 appear to be satisfied in straightforward employment discrimination claims, since the law is clear that race cannot be a factor in hiring decisions.

Having determined that the Special Master applied the correct standard, the next step in the inquiry is whether the Master reached the right conclusion. The Special Master was engaged to compute the amount of damages on a class-wide basis. The findings of fact necessary to determine the amount of damages must be accepted unless clearly erroneous. Fed.R.Civ.P. 53(e)(2). However, a unique feature of punitive damages is that they are awarded as a matter of discretion, not as a matter of right. "If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive

damages is left to the jury, which may or may not make such an award." *Smith v. Wade*, 461 U.S. at 51, 103 S.Ct. at 1638, *quoting* D. Dobbs, *Law of Remedies* 204 (1973). While the Special Master may make a finding on the amount of punitive damages the class may receive, the discretion to award the punitive damages remains with the Court. Nothing in the Order of Reference or the Order of Protocol suggests otherwise.

■ A review of the events of March 27, 1979, and the subsequent EEOC investigation lead to the conclusion that punitive damages would not serve a purpose in this case. The events of March 27, 1979, are unique. The defendant (through its hiring clerk, Ms. Lane) were overwhelmed by the number of applicants who appeared at the Carbondale hiring office. The number far outstripped the capability to process the applicants. Moreover, it would be unusual for so many black applicants to apply in the future on the same day. While the reaction of Ms. Lane and the defendant are blameworthy,[17] in the context of the events of March 27, 1979, her reaction does not support an award of punitive damages.

Moreover, the Special Master should not have considered the defendant's conduct during the EEOC investigation. The Court is inclined to agree that the defendant's conduct amounted to purposeful deception of the EEOC investigators, and will accept the Master's finding of fact on this point. This conduct, however, related only to the EEOC investigation of the claim of class representative Mister. Mister's individual claim was dismissed by this Court; the dismissal was upheld by the Seventh Circuit. Punitive damages (particularly in a class action context) may be supported by a pattern of conduct beyond the activities which support the allegations of a lawsuit. In this case, however, the misleading statements made to the EEOC in the course of one investigation (in a claim ultimately

---

17. The statements of Ms. Lane regarding workers from East St. Louis and the railroad supervisor to the employment agency inquiring if the agency sent the "minority applicants" have an element of subtle racism. However, Ms. Lane denies having made the statement, and the identity of the railroad supervisor is unknown. Therefore, it is disputed whether these statements were ever made.

found without merit by this Court and the Seventh Circuit) do not establish a pattern of conduct sufficient to support punitive damages. Since no pattern of conduct has been established, punitive damages should not be awarded to the class based on ICG's actions relating to a claim which has been adjudged without merit.

For these reasons, punitive damages are not recoverable in this case. The Court's decision not to award punitive damages in this case should not be taken to mean that the Court condones the conduct of ICG. Racial discrimination, in all its forms, is repugnant and should be deterred. Moreover, the actions of ICG during the EEOC investigation of Mister's claim should not be tolerated. The events of March 27, 1979, are unique and are unlikely to be repeated; for this reason, punitive damages would not serve a deterrent purpose. However, if ICG were placed in the same situation in the future and reacted similarly, punitive damages would be particularly appropriate under these facts.

### IV.  Motion to Disqualify

The motion to disqualify the Special Master consisted of two prongs. The first prong was that the Master should be disqualified because of his conflict of interest with the defendant's expert witness. That conflict of interest is now moot, since defendant's expert witness will not be testifying in the case in which the Special Master is counsel. The second prong of the motion was that the Master had a bias in this case due to his representation of other plaintiffs in employment discrimination lawsuits. The specific areas of bias have been addressed in this memorandum, either explicitly or implicitly.[18] Therefore, since all the issues raised by the motion have been resolved, the motion to disqualify ought to be denied as moot.

18. For example, one area of concern for the defendant was an order requiring it to disclose the amount of reserve it maintained for the payment of damages in this case. The amount of reserve is only relevant to an award of punitive damages; since punitive damages are unavailable, the order requiring defendant to disclose its reserves should be vacated as moot.

Moreover, at this point the stay imposed on this case ought to be lifted. The parties may proceed with discovery and the Special Master should proceed with his work on a final report. The parties are not to engage in any discovery without an order by the Special Master. In conducting discovery and preparing the final report, the Special Master should conduct proceedings consistent with this memorandum.

The motion to disqualify is DENIED; the motion to lift stay is GRANTED. The Special Master is requested to meet with the parties at the earliest practical time to determine how he wishes to proceed with preparation of a final report and to schedule further discovery consistent with this memorandum.

IT IS SO ORDERED.

### ON MOTION TO CERTIFY FOR PERMISSIVE INTERLOCUTORY APPEAL

On March 26, 1992, this Court entered a Memorandum and Order which significantly limited the issues remaining in this case. Specifically, the Court held that, as a matter of law, the plaintiff class was entitled to recover damages only for lost back-pay and emotional distress suffered by the class as a result of the defendant's discrimination. The plaintiff seeks to certify this question for a permissive interlocutory appeal under 28 U.S.C. § 1292(b).[1] Upon review of the plaintiff's motion, the response, and the Court's order of March 26, 1992, the Court has determined that all the elements for certification under § 1292(b) are not present in this case. Therefore, the Court will not certify the order for a permissive interlocutory appeal.

Section 1292(b) provides an escape hatch from the final judgment rule. "As compared to final judgment appeals under

1. In the alternative, the plaintiff class seeks the entry of judgment under Federal Rule of Civil Procedure 54(b). In order to enter judgment under Rule 54(b), the Court must adjudicate a claim for relief. Because the Court has decided only that certain types of damages are not available to the plaintiff class, Rule 54(b) is inapplicable.

§ 1291, the fundamental purpose of § 1292(b) is to permit discretionary avoidance of the final judgment requirement." 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure: Jurisdiction* § 3929 at 146 (1977). In order to certify a question for interlocutory appeal, there must be: 1) an order by the court on a controlling question of law; 2) as to which there is substantial ground for disagreement; and 3) the resolution of the entire case would be substantially advanced by a ruling from the circuit court on the question. 28 U.S.C. § 1292(b); *Segni v. Commercial Office of Spain*, 650 F.Supp. 1045, 1046 (N.D.Ill.1987). The first two requirements are met here; the third is not.

■ This action was filed in 1981, alleging racial discrimination by the defendant Illinois Central Gulf Railroad Company in its hiring. After a bench trial on the issue of liability only, the Court determined that the plaintiff had showed a prima facie case, but that the defendant offered a legitimate, non-discriminatory reason for the discrepancy between the number of blacks and whites hired by the defendant. *Mister v. Illinois Central Gulf Railroad Company*, 639 F.Supp. 1560 (S.D.Ill.1986). The plaintiff appealed, and the Seventh Circuit reversed the finding with regard to the class claims. *Mister v. Illinois Central Gulf Railroad Company*, 832 F.2d 1427 (7th Cir.1987). The Supreme Court denied the defendant's petition for certiorari in 485 U.S. 1035, 108 S.Ct. 1597, 99 L.Ed.2d 911 (1988). On remand, this Court was required to determine the proper remedy.

The Court's order of March 26, 1992, substantially limits the damages the plaintiff class may recover. The plaintiff class sought punitive damages, as well as damages for loss of enjoyment of life and impaired earning capacity. The Court held that the plaintiff could not, as a matter of law, recover those damages in this case. Therefore, the Court's order of March 26, 1992, involves a controlling question of law. On a theoretical level, the order bars the plaintiff from presenting any evidence on certain theories of damages. Therefore,

the March 26 order is controlling as to the availability of these theories unless the order is reversed by the circuit. As a practical matter, the March 26 order disposes of a large part of the damages the plaintiff had hoped to recover. For both these reasons, the Court concludes that the March 26 order involves a controlling question of law.

The Court also finds that there is substantial ground for disagreement with the Court's March 26 ruling. The theories presented by the plaintiff class were novel. While novelty alone does not satisfy the requirement for a permissive interlocutory appeal, the lack of clear precedent indicates that the question of law is unsettled. The scope of damages which may be recovered under 42 U.S.C. § 1981 is unclear. The unsettled state of the law is seen in the amendments made by the Civil Rights Act of 1991, which appears to allow for damages for "loss of value of life". *See* Pub.L. No. 102–166 § 102(b)(3), 105 Stat. 1071, 1073 (1991). Moreover, there appears to be authority for the proposition that impaired earning capacity may be recovered in a civil rights suit; it is unclear, however, that impaired earning capacity may be recovered in a class action alleging discrimination in hiring.

The Court's decision on punitive damages also involves a novel interpretation of the Supreme Court's decision in *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). This Court held that, in a bench trial, it can exercise the same discretion as a jury with regards to punitive damages. In other words, even though the defendant's conduct may be sufficient to trigger an award of punitive damages, a court acting as a fact finder is not required to award punitive damages. The Court decided not to award punitive damages in spite of the findings of the Special Master that punitive damages were appropriate in this case. The Court acknowledges that there exists substantial disagreement over this ruling.

Whether the ultimate termination of this case would be advanced by a ruling from the circuit court is a more difficult ques-

tion. Plaintiff suggests that discovery and trial of the remaining theories of damages would proceed during the appellate process. *See* 28 U.S.C. § 1292(b). The availability of back-pay, prejudgment interest, and damages for emotional distress under § 1981 is not substantially in dispute.[2] Therefore, an immediate appeal would advance the ultimate termination of this litigation since the parties would not have to wait until a final ruling by this Court on the amount of back-pay and other damages before receiving a final ruling from the circuit court on what is the heart of the case.

On the other hand, the past conduct of the parties to this action indicates that it is probable that the final ruling on the issue of back pay, interest, and emotional distress would be appealed, regardless of the amount awarded. If certification is granted, and a permissive interlocutory appeal taken from the March 26 order, the circuit court would be faced with two appeals, rather than one. The ultimate termination of the litigation would not be advanced if the appeals are multiplied in this manner.

Even disregarding the possibility of multiple appeals, the ultimate termination of this litigation would not be advanced by a certification of this Court's March 26 order. The Court believes that all the discovery and hearings necessary to make a final determination of the appropriate remedy may be completed in less time than the resolution of an interlocutory appeal. Under these circumstance, the ultimate determination of the litigation would occur more quickly if the plaintiff appealed from the final judgment of the Court rather than proceed with this litigation on two levels.

The Court DENIES plaintiff's motion for certification under 28 U.S.C. § 1292(b). The Court finds that its March 26, 1992, memorandum and order involves controlling questions of law over which there is substantial ground for disagreement. However, the resolution of these questions would not materially advance the ultimate termination of this litigation.

Plaintiff has also filed a motion to shorten the time for defendant's response to his motion for certification. Defendant's response was due on April 17, 1992; the motion requests that the response be filed by April 17, 1992. The Court is uncertain what plaintiff was seeking to accomplish through his motion. Therefore, the motion is DENIED.

IT IS SO ORDERED.

---

**2.** Defendant in this case argues that no emotional distress can be recovered by the class. This argument is based on the facts of this particular case rather than the general legal principles of what remedies are available under § 1981.